## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JAMES T. GRESHAM,<br><br>                    Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of the Social Security<br>Administration,<br><br>                    Defendant. | 8:16-CV-54<br><br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff James T. Gresham's disability insurance benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq*. and § 1381 *et seq*. The Court has considered the parties' filings and the administrative record, and reverses the Commissioner's decision to deny benefits. The Court will remand this case to the Commissioner for calculation and award of benefits.

## I. PROCEDURAL HISTORY

Gresham filed applications for disability insurance benefits and supplemental security income in February 2013. Gresham's claims were denied initially (T107-110) and on reconsideration (T118-121). Following a hearing, an administrative law judge (ALJ) determined that Gresham was not disabled under the Social Security Act, and therefore not entitled to disability benefits. T22. The ALJ determined that, although Gresham suffered from severe impairments, he had the residual functional capacity to perform other jobs that exist in significant numbers in the national economy. T14-T22. The Appeals Council of the Social Security Administration denied Gresham's request for review of the ALJ's decision. T1-3. Gresham's complaint seeks review of the ALJ's decision as the final decision of the Commissioner under sentence four of 42 U.S.C. § 405(g). Filing 1.

## II. FACTUAL BACKGROUND
### 1. MEDICAL HISTORY

Gresham's medical history is generally summarized as follows. In 2005, after experiencing numbness from the neck down, Gresham underwent a

magnetic resonance imaging (MRI), which detected the possibility of multiple sclerosis (MS). Gresham underwent a second MRI soon thereafter, and that report, too, was consistent with MS. T266.

The numbness recurred in 2011. So, on or around February 1, Gresham visited Dr. Rana Zabad, a neurologist at the University of Nebraska Medical Center. T18; *see* T279-282. According to Dr. Zabad, Gresham's recurrence "started with the left arm, moved to the left leg, then to the contralateral side." T280. Records from the visit also indicate that Gresham was experiencing fatigue, was "very moody and sometimes verbally aggressive," and had—since 2006—been experiencing "throbbing headache[s] associated to phonophobia and photophobia." T280. Dr. Zabad concluded with relative certainty that Gresham had relapsing and remitting MS, but decided against prescribing medication, noting that Gresham was "recovering nicely" from the relapse. T281.

In 2013, Gresham went back to Dr. Zabad, reporting that his left side was totally numb, his bladder control was "not optimal," and that he was experiencing problems maintaining balance. T266. In her reports, Dr. Zabad confirmed Gresham's relapsing and remitting MS, writing that he "has a high burden of disease on his cervical spinal cord and brain stem." T268. But she expressed concern regarding "disease-modifying therapy," citing Gresham's prior "nonadherence and risky behavior." T268. "If he desires therapy," she wrote, "I feel comfortable that he goes on Copaxone, which is known to be safe and does not require any monitoring." T268.

Gresham had several follow-up visits with Dr. Zabad in 2013 and 2014. *See*, T269-272; T295-96; T358-360; T362-64. The records from those visits are largely consistent, and reflect Gresham's general complaints regarding numbness, blurred vision, and frequent urination. T18-19; T295; T358. But they also suggest, to some degree, the relative normality of Gresham's physical capabilities. In one report, for example, Dr. Zabad writes: "[Gresham] is exercising more: pull ups, cardiovascular 3x/week for 30-45 minutes." T358. And in others, she comments (or otherwise indicates) that Gresham is ambulatory, that his motor and coordination is normal, and that he is mentally sound. T18; T296-97; T359-360.

On September 9, 2013, Dr. Zabad issued a letter to Gresham's attorney supporting his present application for Social Security benefits. In the letter, Dr. Zabad wrote that Gresham's symptoms—namely, his inability to walk for prolonged periods of time, bladder urgency, and significant fatigue—render him unable to work. T376-77. She elaborated:

> Very early on [Gresham] had a relapse that affected the left side of his body including the arm and leg. Although on his

neurological examination his motor deficit is not significant, it is well known however that in patients with multiple sclerosis strength worsens with repetitive activity and exertion. Therefore I don't believe that he can sustain a job that requires him to stand and/or walk for six hours out of an eight-hour day because of his muscular fatigability.

. . .

Due to the symptoms described above, James is likely to miss at least three days of work in a month due to his relapsing-remitting multiple sclerosis. Furthermore based on the symptoms which are constant and chronic and likely to worsen with time, I do not believe that he's able to work eight hours a day, five days a week on a regular and continuing basis.

T355.

Dr. Zabad wrote another letter on Gresham's behalf on July 31, 2014. T376. There, Dr. Zabad reiterated her concerns regarding Gresham's ability to work, citing fatigue and bladder urgency, among other issues. T376. She also noted the results of a July 29, 2014 MRI, which revealed "progression of his left sided weakness," but no new inflammation. T376. She continued, "[a]s his MRI is [] not showing inflammation, it means that [Gresham] is reaching the point where he is progressing because of the nerve cells dying. Unfortunately this is not something amenable to treatment with medication or physical therapy and is the signature of a chronic progressive and irreversible disease such as MS." T376

The record also contains reviews from state agency medical consultants Jerry Reed, M.D., and Robert Roth, M.D. *See*, T65-72; T93-102. Based on Dr. Reed's observations, Gresham's conditions do, in some respects, limit his ability to work. But overall, he said, "[w]e have determined that your condition is not severe enough to keep you from working." T72. Dr. Roth reached the same result upon reconsideration, although cautioning that Gresham's MS and history of migraines "may progress over time." T96. "At this point however, medical evidence appears to show some stability in his disease with only moderate symptoms." T96.

## 2. HEARING TESTIMONY

At the administrative hearing, Gresham testified to his medical condition and symptoms, which generally mirrored the symptoms discussed above. He explained, for example, the numbness on the left side of his body

and his persistent feeling of dizziness and fatigue. T35-36. He also described certain limitations regarding the use of his left arm and leg, such as an inability to lift or carry objects or walk long distances. T39-42. And he described problems pertaining to bladder control and migraines, which he experiences, on average, four times a week. T49. As a result of these symptoms, Gresham testified, he has difficulty standing for over an hour; is required to take at least a 1 hour nap per day; is unable to sit in a standard "business chair"; is sensitive to heat; and is limited in energy and physical mobility. T34-53.

The ALJ then questioned Gresham about his physical capabilities, particularly in light of his purported limitations. On this point, the ALJ noted that, according to the record, Gresham was capable of going to the grocery store, taking short walks, and performing yard work. T51-52. Gresham confirmed these reports, noting his ability to perform basic tasks for short periods of time. T52. The ALJ also asked about Gresham's exercise regimen which, at one time, included cardiovascular activities four times a week. T53. Gresham responded:

> Yes, that's when the MS wasn't, it wasn't bothering me as much. It has, like I said, I have good days and I have bad days. But since my last attack I've had to slow down. There's certain things, I've been going through an MS support group and they've been showing me how to do certain things, but I have not been able to do a lot of things that I would like to do.

T53. The ALJ then reviewed Gresham's work history dating back to 1998, noting Gresham's prior work as a machinist, welder, maintenance worker, and laborer. T 53-57.

Against this backdrop, the ALJ presented the vocational expert (VE) with a hypothetical based on a "younger individual with a high school education" whose past work history was the same as Gresham's, and who was limited to performing "a full range of light work." T58-59. Such a person, the VE opined, could perform light, unskilled work, such as housekeeper or mail clerk. T59. Citing Dr. Zabad's findings, the ALJ then added a condition to the hypothetical, asking the VE to assume, in addition to the conditions described above, that the individual would likely miss at least 3 days of work in a month due to the severity of his symptoms. T59. With that addition, the VE opined that the claimant would be unable to sustain work. T60. The ALJ then added a different condition, which was also responsive to Dr. Zabad's findings: that the claimant would require a 1 hour break, "in addition to whatever normal breaks" are afforded the employee, to rest or take a nap.

- 4 -

T60. Again, the VE opined that, with the addition, the claimant would be unable to sustain work. T60-61.

### 3. SEQUENTIAL ANALYSIS AND ALJ FINDINGS

To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4).

#### (a) Step One

At the first step, the claimant has the burden to establish that he has not engaged in substantial gainful activity since his alleged disability onset date. *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006); 20 C.F.R. § 404.1520(a)(4)(i). If the claimant has engaged in substantial gainful activity, the claimant will be found not to be disabled; otherwise, the analysis proceeds to step two. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(i).

In this case, the ALJ found that Gresham had not engaged in substantial gainful activity since his alleged disability onset date, and that finding is not disputed on appeal. T13-14.

#### (b) Steps Two and Three

At the second step, the claimant has the burden to prove he has a "medically determinable physical or mental impairment" or combination of impairments that is "severe[,]" 20 C.F.R. § 404.1520(a)(4)(ii), in that it "significantly limits his physical or mental ability to perform basic work activities." *Gonzales*, 465 F.3d at 894; *see also Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007). Next, "at the third step, [if] the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits." *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the analysis proceeds.

In this case, at step two, the ALJ found that Gresham had the following severe impairment: relapsing-remitting multiple sclerosis. T14. At step three, however, the ALJ found that Gresham did not have an impairment or combination of impairments that met or medically equaled a listed impairment. T15. Gresham does not dispute this finding on appeal.

#### (c) Residual Functional Capacity

Before moving to step four, the ALJ must determine the claimant's residual functional capacity (RFC), which is then used at steps four and five. 20 C.F.R. § 404.1520(a)(4). "'Residual functional capacity' is defined as 'the most [a claimant] can still do' despite the 'physical and mental limitations that affect what [the claimant] can do in a work setting' and is assessed based on all 'medically determinable impairments,' including those not found

to be 'severe.'" *Gonzales*, 465 F.3d at 894 n.3 (quoting 20 C.F.R. §§ 404.1545 and 416.945).

To determine a claimant's RFC, the ALJ must consider the impact of all the claimant's medically determinable impairments, even those previously found to not be severe, and their related symptoms, including pain. 20 C.F.R. §§ 404.1529(d)(4) and 404.1545(a)(1) and (2). This requires a review of "all the relevant evidence" in the case record. 20 C.F.R. § 404.1545(a). Although the ALJ is responsible for developing the claimant's complete medical history, 20 C.F.R. § 404.1545(a)(3), the claimant bears the burden of proof to demonstrate his or her RFC. *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will consider "statements about what [the claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations," as well as descriptions and observations of the claimant's limitations caused by his impairments, including limitations resulting from symptoms, provided by the claimant or other persons. 20 C.F.R. § 404.1545(a)(3).

The RFC assesses the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(4). The mental requirements of work include, among other things, the ability: to understand, remember, and carry out instructions; to respond appropriately to supervision, coworkers, and work pressures in a work setting; to use judgment in making work-related decisions; and to deal with changes in a routine work setting. 20 C.F.R. §§ 404.1545(c) and 404.1569a(c); SSR 96-8p, 61 Fed. Reg. 34474-01, 34477 (July 2, 1996). An RFC must assess the claimant's ability to meet the mental requirements of work, 20 C.F.R. § 404.1545(a)(4), which includes the ability to respond appropriately to coworkers and work pressures. 20 C.F.R. §§ 404.1545(c) and 404.1569a(c); SSR 96-8p, 61 Fed. Reg. at 34477. The RFC must include all limits on work-related activities resulting from a claimant's mental impairments. SSR 85-16, 1985 WL 56855, at *2 (1985).

A special procedure governs how the ALJ evaluates a claimant's symptoms. The ALJ first considers whether the claimant suffers from "medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms." 20 C.F.R. § 404.1529(a) to (c)(1). A medically determinable impairment must be demonstrated by medical signs or laboratory evidence. 20 C.F.R. § 404.1529(b). If this step is satisfied, the ALJ then evaluates the intensity and persistence of the claimant's symptoms to determine how they limit the claimant's ability to work. 20 C.F.R. § 404.1529(c)(1). This again requires the ALJ to review all available evidence,

including statements by the claimant, "objective medical evidence,"[1] and "other evidence."[2] 20 C.F.R. § 404.1529(c)(1) to (3). The ALJ then considers the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, and evaluates them in relation to the objective medical evidence and other evidence. § 404.1529(c)(4). Ultimately, symptoms will be determined to diminish the claimant's capacity for basic work activities, and thus impact the claimant's RFC, "to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*; § 404.1529(d)(4).

In assessing the credibility of a claimant's subjective testimony regarding his or his alleged symptoms, the ALJ must weigh a number of factors. *See, Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009); 20 C.F.R. § 404.1529(c)(3)(i–vii).[3] When deciding how much weight to afford the opinions of treating sources and other medical opinions regarding a claimant's impairments or symptoms, the ALJ considers a number of factors set forth in 20 C.F.R. § 404.1527.

The ALJ determined that Gresham had the RFC to perform "the full range of light work" as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). T16. In reaching this conclusion, the ALJ found that Gresham's "medically determinable impairments could reasonably be expected to cause some [of] the alleged symptoms"; but that Gresham's statements "concerning the intensity, persistence and limiting effects of these symptoms are not fully credible" to the extent they were inconsistent with the ALJ's RFC assessment. T16-17. On this point, the ALJ noted inconsistencies between Gresham's purported inability to work and, for example, his prior employment history. T17. Further, the ALJ compared Gresham's medical records to certain statements and writings in Gresham's present application for disability benefits, noting:

> [In Gresham's interrogatories], he reported that he has pain
> throughout his entire body. However, at his last visit of record to

---

[1] 20 C.F.R. §§ 404.1529(c)(2) and 404.1528(b) and (c).

[2] "Other evidence" includes information provided by the claimant, treating and non-treating sources, and other persons. *See* 20 C.F.R. § 404.1529(a) (and sections referred to therein); *see also* 20 C.F.R. § 404.1529(c)(3).

[3] In assessing a claimant's credibility, the ALJ should consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Moore*, 572 F.3d at 524.

> the MS Clinic two weeks earlier, the claimant reported that he had no pain. The claimant testified that he suffers urinary incontinence, twice a month. However . . . while he has reported urinary urgency to his providers, he has denied incontinence. The claimant also reported a history of vertigo causing him to fall. However the progress notes from the MS Clinic note that he has no history of vertigo and while he has reported some imbalance and incoordination, he has made no mention of falling.

T17 (internal citations omitted).

Further, in determining Gresham's RFC, the ALJ declined to fully credit the medical opinions of Gresham's treating physician, Dr. Zabad. T20. In doing so, the ALJ provided examples of purported inconsistencies between Dr. Zabad's findings, and other record evidence, writing:

> Based on the evidence summarized above, I am unable to fully credit the opinions of Dr. Zabad. To begin with, disability is the ultimate issue reserved for the Commissioner herein. [Dr. Zabad's] opinions are inconsistent with the fact that the claimant returned to work at the medium exertional level after the January 2011 relapse at the medium and very heavy exertional levels and sought no treatment between March 2011 and March 2013. While physical examinations showed more significant motor deficits in July 2014, an MRI taken at that time was unchanged compared to 2013, found no active enhancing lesions and did not support the conclusion that the claimant had suffered a relapse. In fact, it was noted at the last visit of record that the claimant was "doing better."

T20. But the ALJ did credit state agency medical consultants Jerry Reed and Robert Roth "to the extent that they are consistent with the residual functional capacity set out above." T20. In light of these findings, and after reviewing the relevant evidence, the ALJ concluded that Gresham's medical conditions did not give rise to disabling limitations. T20.

### (d) Steps Four and Five

At step four, the claimant has the burden to prove that he lacks the RFC to perform his past relevant work. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can still do his past relevant work, he will be found to be not disabled, otherwise, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to prove, considering the

claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can perform. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(v).

Here, at step four, the ALJ found that Gresham was unable to perform any past relevant work. T21. But at step five, based on the testimony of the VE, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that Gresham could perform. T1. So, the ALJ concluded that Gresham was not under a disability, and denied his claims for benefits. T22.

## III. STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id.* The Court must consider evidence that both supports and detracts from the ALJ's decision, but will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id.* The Court reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011). And the Court defers to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).

## IV. ANALYSIS

Gresham argues that the ALJ did not properly evaluate and weigh the opinions of Dr. Zabad, Gresham's treating neurologist. *See* filing 11-1 at 11. By failing to do so, Gresham argues, the ALJ "impermissibly invaded the province of the treating neurologist," and otherwise "played doctor" in determining the outcome of Gresham's application. Filing 11-1 at 18, 27. In response, the Commissioner argues that the ALJ need not, in every instance, provide controlling weight to a treating physician. Filing 20 at 8. And because Dr. Zabad's opinions are "inconsistent with the objective evidence," the ALJ was not required to do so here. Filing 20 at 9.

As noted above, Dr. Zabad submitted letters in which she described Gresham's symptoms as "constant, chronic and worsening with time." T377; T356. As a result of these symptoms, she wrote, Gresham would likely miss at least 3 days of work a week and would be unable to work at all on a regular and continuing basis. T356; T377. She also noted Gresham's "significant fatigue," which can occur "at any stage of [MS]." T376. These findings were then incorporated into the hypothetical question posed to the VE at Gresham's hearing. As noted above, the VE concluded that, under the circumstances described (i.e., missing 3 days of work a month or requiring an hour-long rest break a day), the claimant would be unable to sustain work. T59-60. Absent those conditions, however, the VE found that an individual similarly situated to Gresham could maintain employment as a mail clerk or housekeeper. T59.

In determining a claimant's RFC, an ALJ is to consider all relevant evidence, including "medical records, observations of treating physicians and others, and [the claimant's] own description of [his] limitations." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007). A treating physician's opinion is generally entitled to substantial weight, but it does not automatically control, as the ALJ must evaluate the record as a whole. *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007). However, when an ALJ discounts a treating physician's opinion, he should give "good reasons" for doing so. *Id.* (citing *Dolph v. Barnhart*, 308 F.3d 876, 878 (8th Cir. 2002)). This standard may be satisfied where a treating physician renders "inconsistent opinions that undermine the credibility of such opinions," or where other medical assessments "are supported by better or more thorough medical evidence[.]" *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)).

Here, the ALJ discounted Dr. Zabad's opinions, finding them inconsistent with other substantial evidence. To this end, the ALJ noted that Gresham, following a 2011 relapse, returned to work at the "medium and very heavy exertional levels" and sought no treatment between March 2011 and March 2013. T20. He also cited Gresham's 2014 MRI, which "found no active enhancing lesions and did not support the conclusion that the claimant had suffered a relapse." T20. And he pointed to a notation in a medical record which suggests that Gresham, at one time, was "doing better." T20.

After reviewing these findings in light of the entire record, the Court concludes that the ALJ erred in discrediting Dr. Zabad's medical opinions. In reaching this decision, the Court acknowledges the Commissioner's argument that, to some extent, Gresham's physical and mental capabilities remain intact. As the ALJ noted in his opinion, and as the Commissioner stresses on appeal, Gresham appears capable, for example, of maintaining his balance

- 10 -

and walking without sufficient difficulty. Filing 20 at 9. The Court also recognizes the absence of medical records from 2011 to 2013 which, according to the ALJ, conflicts with Dr. Zabad's assessment regarding the severity of Gresham's condition. And finally, the Court has reviewed the medical record cited in the ALJ's opinion in which Dr. Zabad's physician's assistant noted that Gresham, at least as of mid-2014, was "doing better." T20; T372.

But these facts must be viewed in light of Gresham's underlying condition. Indeed, unlike impairments that are subject to linear decline or improvement, relapsing and remitting MS is, by its very nature, "a disease that waxes and wanes." *Klaus v. Colvin*, 2016 WL 1435687, *6 (M.D.N.C. 2016) (internal quotation marks and citations omitted); *see Wilcox v. Sullivan*, 917 F.2d 272, 276 (6th Cir. 1990) (MS is an "incurable, progressive disease subject to periods of remission and exacerbation"). Thus, periodic reports of stability or improvement in Gresham's condition fail to hold the significance the ALJ placed upon them. *Klaus*, 2016 WL 1435687, at *6.

Nor does the Court find significant discrepancies between Dr. Zabad's medical assessments and the results of Gresham's 2014 MRI. On this point, the ALJ suggests that the MRI undermines Dr. Zabad's medical opinion regarding the progression of Gresham's relapsing and remitting MS, writing:

> While physical examinations showed more significant motor deficits in July 2014, an MRI taken at that time was unchanged compared to 2013, found no active enhancing lesions and did not support the conclusions that the claimant had suffered a relapse.

T20. But according to Dr. Zabad, the "unchanged" nature of Gresham's 2014 MRI is, itself, the cause of concern. Indeed, in her July 31 letter, Dr. Zabad acknowledges that Gresham's 2014 MRI "[does] not show new inflammation." T376. But she goes on to say:

> It is known that progression in MS is due to 2 different reasons: inflammation, which is usually treatable, and neurodegeneration which means death of the nerve cells. As his MRI is [] not showing inflammation, *it means that he is reaching the point where he is progressing because of the nerve cells dying*. Unfortunately this is not something amendable to treatment with medication or physical therapy and is the signature of a chronic progressive and irreversible disease such as MS.

T376 (emphasis added). Thus, the MRI does not *undermine* the treating physician's opinions, it *reinforces* them.

- 11 -

The ALJ further supported his decision by referencing a notation in the last available visit of record. T20. There, Dr. Zabad's physician's assistant writes that Gresham was, overall, "doing better." *See*, filing 20 at 11; T20. But the medical record also lists several purported symptoms associated with Gresham's visit, including numbness, bladder problems, and difficulty walking. *See* T366. And as discussed above, those symptoms are consistent with Dr. Zabad's findings regarding the nature and severity of Gresham's MS. Thus, for many of the reasons discussed above, the notation is not sufficient grounds for discrediting Gresham's treating physician.

As a final, and more general matter, the Commissioner cites instances in the record which, she claims, "undermine Dr. Zabad's opinion regarding Plaintiff's fatigue[.]" Filing 20 at 11. For example, she notes that despite Gresham's complaints, he was nonetheless able "to take walks, perform cardiovascular exercise . . . sweep, rake leaves, mow the lawn, and wash windows." Filing 20 at 11. "Moreover," she writes, "Plaintiff took college classes and attended religious services twice a week." Filing 20 at 11. But Gresham need not prove that he is bedridden or "completely helpless" to be found disabled under the applicable regulations. *Reed*, 399 F.3d at 923. Rather, the inquiry is whether the claimant can perform full-time competitive work. And, as the Eighth Circuit has recognized, "the ability to do activities such as light housework and visiting with friends" is of little consequence to the underlying analysis. *Id.* (quoting *Burress v. Apfel*, 141 F.3d 875, 881 (8th Cir. 1998)).

In sum, the Court is well aware that an ALJ may discount or even disregard the opinion of a treating source where other medical assessments are supported by better or more thorough medical evidence, or where a treating source renders inconsistent opinions that undermine the credibility of such opinions. *Id.* at 921. But Dr. Zabad's opinion was the only opinion in the record from a physician who had even examined Gresham regarding his relapsing-remitting MS. The ALJ discounted Dr. Zabad's assessment in favor of the opinion of non-treating, non-examining physicians who relied exclusively on medical records to arrive at an opinion. *See Shontos v. Barnhart*, 328 F.3d 418, 425 (8th Cir. 2003). The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole upon which to base a denial of benefits. *Id.* at 427. On the record before the Court, the ALJ should have given controlling weight to Dr. Zabad's opinion with respect to Gresham's conditions.

Having reached that conclusion, it is unnecessary for the Court to consider Gresham's other arguments. The evidence is uncontested that given an RFC based on Dr. Zabad's opinion of Gresham's limitations, there is not a

significant number of jobs in the national economy that Gresham can perform. *See, Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(v). So, under step five of the sequential analysis, Gresham is entitled to benefits. The Court will therefore reverse the Commissioner's decision and remand for an award of benefits. *See Shontos*, 328 F.3d at 427.

## V. CONCLUSION

The Court has reviewed the administrative record and finds that the ALJ erred in not affording controlling weight to Dr. Zabad's opinion. The Court will reverse the Commissioner's decision and remand the case for an award of benefits.

IT IS ORDERED:

1.   The Commissioner's decision is reversed.

2.   This matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for calculation and award of benefits.

3.   A separate judgment will be entered.

Dated this 27th day of March, 2017.

BY THE COURT:

John M. Gerrard
United States District Judge

- 13 -